UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
***************

JAVIER LUIS
      Plaintiff

v.

                                  Case No. 8:12-CV-00500-VMC-AEP

JOSEPH C. ZANG, CARLA BERGMANN,
JOSEPH O. ZANG, JOSEPH ZANG BUILDERS,
JOSEPH ZANG CUSTOM BUILDER, ZANG
GENERAL CONTRACTORS, INC, MARY ZANG,
MARY JILL DONOVAN, MICHAEL MCCAFERTY,
DONOVAN LAW AND AWARENESS TECHNOLOGIES
      Defendants.
_____/

**PLAINTIFF'S FIRST AMENDED COMPLAINT**
**REQUEST FOR INJUCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

      Plaintiff JAVIER LUIS hereby commences an action for a vast number of violations of state and federal law committed against him by the defendants.

**SUMMARY OF THE ACTION**

      This is an action for monetary relief arising from violations of 18 USCA §2510 et seq ('Wiretap Act'), Florida's Security of Communications Act ('SOCA'), and Ohio's Revised Code §2933.52, Computer Hacking, as well as injunctive relief from futher illegal use of illegally obtained communications. Plaintiff also asserts common-law violations of Invasion of Privacy, Conspiracy to Commit Invasion of Privacy, Intentional Infliction of Emotional Distress, Defamation, Harassment and Civil Conspiracy.

1.     Plaintiff JAVIER LUIS is an adult resident of Tampa, Florida.

2.     Defendant JOSEPH C. ZANG ('JUNIOR') is an adult resident of Cincinnati, Hamilton County, Ohio and still lives in his childhood home ('MOMSHOUSE'), supposedly still owned by his mother, located on Starvue Drive in Cincinnati, Ohio.  All all times relevant to this action, JUNIOR had ownership interest in defendants' JOSEPH ZANG CUSTOM BUILDERS and ZANG GENERAL CONTRACTORS, INC, which are located in his dad's house on "Devils Backbone Road" ('DEVILS ROAD') in Cincinnati, Ohio.

3.     Defendant JOSEPH ZANG ('SENIOR') is an adult resident of Cincinnati, and lives on DEVIL'S ROAD in Hamilton County, Ohio. At all times relevant, SENIOR had ownership interest in fellow defendants' ZANG GENERAL CONTRACTORS, INC, and JOSEPH ZANG BUILDERS located on DEVILS ROAD.

4.     Defendant MARY ZANG ('LANDLORD') is an adult resident of Cincinnati, Hamilton County, Ohio who also lives on DEVILS ROAD with SENIOR.  She is listed as the supposed landlord of MOMSHOUSE occupied by JUNIOR on Starvue Drive.

5.     Defendant BERGMANN ('BERGMANN') is an adult employee of, and with ownership interest in, defendants' JOSEPH ZANG CUSTOM BUILDERS and ZANG GENERAL CONTRACTORS, INC.  At all times relevant to this action, BERGMANN was employed with said defendants.

6.     Defendant JOSEPH ZANG BUILDERS ('JZ BUILDERS') is a business operating under the laws of Ohio, with its principal place of business in Cincinnati, Hamilton County, Ohio.  JZ BUILDERS was started in 1957 by SENIOR.  On information and belief, defendants JUNIOR, SENIOR and LANDLORD are managing members with ownership interest in the company.

2

7.     Defendant JOSEPH ZANG CUSTOM BUILDERS ('JZ CUSTOM') is a business operating under the laws of Ohio, with its principal place of business in Cincinnati, Hamilton County, Ohio.  On information and belief, JUNIOR and BERGMANN are managing members with ownership interest in the company.

8.     Defendant ZANG GENERAL CONTRACTORS, INC. ('ZGC') is a business operating under the laws of Ohio, with its principal place of business in Cincinnati, Hamilton County, Ohio.  ZGCI was started in 1960 by SENIOR.  On information and belief, JUNIOR, SENIOR, BERGMANN, and MARY ZANG are managing members with ownership interest in the company.

9.     Defendant MARY JILL DONOVAN ('MJ DONOVAN') is an attorney licensed to practice law in Ohio and, on information and belief, is a resident of Cincinnati, Hamilton County, Ohio.  At all times relevant to this action, MJ DONOVAN was employed as an attorney with, and was a principal of DONOVAN LAW.

10.    Defendant MICHAEL MCCAFFERTY ('MCCAFFERTY') is an attorney licensed to practice law in Ohio and, on information and belief, is a resident of Cincinnati, Hamilton County, Ohio.  At all times relevant to this action, MCCAFFERTY was employed as an attorney with, and was a principal of DONOVAN LAW.

11.    Defendant DONOVAN LAW is a law practice operating under the laws of the state of Ohio with its principal place of business in Cincinnati, Hamilton County, Ohio.  On information and belief, MJ DONOVAN and MCCAFFERTY are and were managing members of DONOVAN LAW at all times relevant to this action.

3

12. Defendant AWARENESS TECHNOLOGIES ("BIGBROTHER") is a software maker located in 4640 Admiralty Way Suite 1010 Los Angeles, CA 90292. BIGBROTHER is maker of WebWatcher computer monitoring software, and is responsible for all marketing and production of this product.

## JURISDICTION AND VENUE

13. Jurisdiction is proper over this civil action under 28 USC §1331 as Plaintiff alleges violation of federal law, namely the Wiretap Act as amended by the Electronic Communications Privacy Act, 18 USC §2510 et seq. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC §1332, and 28 USC §1367(a). Plaintiff invokes the pendant jurisdiction of this Court to hear and decide claims arising out of state law as those claims are related to Plaintiff's federal claims. All relevant claims are inextricably entwined, having arisen out of a common nucleus of related facts, so as to form part of the same case of controversy under Article III of the United States Constitution.

14. Venue is proper under 28 U.S.C. §1391(b)(2), as all of the thousands of illegally intercepted communications giving rise to Plaintiff's claims originated in Plaintiff's home, which is located in the Middle District of Florida.

## GENERAL ALLEGATIONS

15. On or around January of 2009, Plaintiff met Catherine Zang ('Cathy') in a "Metaphysics" chatroom on the internet.

16. Plaintiff quickly realized that Cathy was hopelessly entangled in a marriage with an extremely verbally abusive husband, JUNIOR. Even a thousand miles away, it was

4

clear to Plaintiff that Cathy showed signs of "battered woman syndrome." Indeed Plaintiff

could hear her husband come home from work and immediately begin yelling at Cathy,

usually something vicious related to her substantial weight gain after having had her third

child. This was a daily ritual for JUNIOR, who was later diagnosed as being a Narcissist by

the very psychiatrist he had the court force his wife to go to, in his desperate attempts to have

her deemed unfit to be a mother. JUNIOR's need to control and manipulate his wife was all

of this was part of a complex and long term scheme to win everything in his pre-plotted

divorce, and leave Cathy defeated and homeless. Plaintiff attempted to steer Cathy towards

some local counselors. Plaintiff quickly realized that JUNIOR, a controlling and

manipulative husband, had financially caged Cathy by having her checking accounts and any

family finances barred from her view. For years JUNIOR had placed his beloved sister and

preferred co-conspirator, BERGMANN in charge of all the family finances. JUNIOR forbid

Cathy from even looking at her bank's balances. JUNIOR then placed Cathy on a strictly

controlled weekly "allowance" from which she had to buy the household's needs. Thus

lacking any access to finances, the internet was Cathy's only lifeline and it was in this

context that Plaintiff attempted to counsel her as to the best course of action for someone in

her terrible situation. Plaintiff then commenced to have daily communications with her from

his home in Tampa, Florida and developed a relationship with her.

      17.    Plaintiff had never met, and still has never met, Cathy in person and his only

communications with her have been on the internet and telephone.

      18.    Years prior to Plaintiff's meeting Cathy, JUNIOR had sealed off the family

garage with a heavy padlock, ostensibly at first to protect his carpenter tools from Cathy's

first son, Zach, but then after Zach moved out, the padlock remained on, and it was not the Mother of the house that was barred from entry to her own garage. Soon it would become obvious why JUNIOR had this room sealed off from her. But JUNIOR did not stop there, as he also forbid his wife entry into various other parts of the home they had shared for more than a decade. It was later learned that JUNIOR had used the sealed garage not only to hide assets from Cathy, as he had preplanned his divorce for many years in advance. Now the sealed garage had become a convenient command and control center for thousands of dollars worth of surveillance equipment JUNIOR would use in his desperate attempts to "get the goods" on his wife, so that he would "get EVERYTHING" in the divorce, as he so proudly would sneer at her.

19. JUNIOR then went about using company funds, co-mingled with that of ALL of SENIOR's Companies located on the DEVILS ROAD location. All of these companies serve as a shelter, and umbrella for one another, serving as a convenient family owned bunker from which to hide assets from the IRS and any pesky litigants who would dare attempt to bring forth legal actions against them.

20. JUNIOR had a fraudulent "lease agreement" with LANDLORD, his mother, he had to ask LANDLORD permission in order to modify parts of her house in order to install the extensive system of video cameras and audio recording devices he then JUNIOR placed in various parts of the house in order to spy on his wife 24 hours a day, 7 days a week. For more than a year these modifications were being done to LANDLORD's home, making it highly unlikely LANDLORD did not know of these sinister developments in the home that she still owned. The Lease was a rent to own, and JUNIOR made payments all required

6

payments out of marital assets, part of which belonged to Cathy. However, in preparation for his pre-plotted divorce, this "Lease to Own" agreement mysteriously turned into a rental agreement. Just in time for the divorce, so that JUNIOR kept the house, and Cathy got kicked out on the streets. LANDLORD had a big hand in this fraud. Her aid in setting up this situation was instrumental to JUNIOR, and helped JUNIOR to illegally intercept Plaintiff's communications, undisturbed by LANDLORD. Not only Plaintiff's, but more than eight other plaintiffs in a related lawsuit, and a multitude of defendants in other parts of the country, many of whom have expressed interest in bringing forth lawsuits of their own.

21. With the permission and/or negligent oversight of LANDLORD, JUNIOR used this den as the command center for an expensive and complex system of round the clock surveillance on his wife Cathy for purposes related to an impending divorce which he had pre-planned years in advance. JUNIOR railroaded and steered Cathy towards the brink of insanity, by a constant barrage of verbal assaults aimed at her weight, in front of her adoring and beloved children.

22. At a time unknown to Plaintiff or Cathy, defendants JUNIOR and BERGMANN secretly wired the marital home, including but not limited to the living room, computer area, dining area and kitchen with computer surveillance, audio and video equipment and later secretly installed software in the family computer. Activity, computer communication transmissions, meetings and conversations were intercepted and audio and video recordings were made from an unknown date and involved parties not limited to the Plaintiff named in this action. None of the Defendants were party to the conversations,

transmissions, meetings or activities and none of the recorded parties had knowledge of or consented to be recorded or to have their communications be intercepted.

23.     JUNIOR and BERGMANN, through and under the financial umbrella of all businesses located at Devils Backbone Road, including defendants JZ BUILDERS, JZ CUSTOM BUILDERS, JOSEPH ZANG BUILDER, and ZGCI, purchased the software and surveillance equipment and used company tools and equipment to secretly install, monitor and intercept communications between Cathy and Plaintiff without their consent.

24.     Cathy first noticed that such recordings may have existed on or about December 18, 2009 at a temporary orders hearing in her divorce case. The legality, specific dates and/or times and the way that such recordings were created were still unknown to Plaintiff.

25.     On or about a time between December 25, 2009 and January 1, 2010 Cathy observed what appeared to be a dvd player in the attached garage on the shelf of the wall parallel to the marital home's living room.

26.     Further investigation by Cathy revealed that surveillance equipment was secretly installed in the living room wall outlets and set up for recording in the garage he had padlocked Cathy out of, and verbally demanded that she not ever attempt entry.

27.     On or about a time between December 25, 2009 and January 1, 2010 Cathy obtained a dvr, a video camera from a wall outlet and a microphone from its installation locations in the attached garage on the shelf of the wall parallel to the marital home's living room and installed in the living room.

28.     At a time uncertain but upon information and belief in 2011, parts of the hard

8

drive of the dvr were copied and revealed that secret recordings were created and various people were recorded during private activities, computer transmissions, meetings and oral conversations. Presumably many of Plaintiff's oral communications with Cathy are among the multitude of illegally intercepted conversations JUNIOR and/or DONOVAN LAW still has in their possession, however not all of the expansive hard drive could be examined before Cathy was ordered to return it to JUNIOR .

   29. Cathy turned over the dvr and other materials to the Green Township Police Department for criminal prosecution of JUNIOR. Upon information and belief, Green Township detective bureau was notified of the confessions of illegal wiretapping. It is not surprising that, based on information and belief, with family ties to MJ Donovan, the detective bureau declined to file criminal charges, wrongly suggesting that there was a "nanny cam exception" to the Ohio Statute. Certainly it did not hurt that MJ Donovan is married to the next possible chief of police in Cincinnati.

   30. JUNIOR and BERGMANN, by and through defendants JZ BUILDERS, JZ CUSTOM BUILDERS, JOSEPH ZANG BUILDERS and ZGCI intercepted, reviewed and created permanent recordings of various modes of legally protected communications without the knowledge or consent of the Plaintiff constituting: an invasion of Plaintiff's privacy, including trespass into the Plaintiff's seclusion, and public disclosure of private facts; a violation of the federal Wiretap Act, the Ohio Revised Code 2933.52, and Florida's SOCA.

   31. JUNIOR and BERGMANN knew by placing the recording devices into the computer, walls and ceilings of the marital home it would intercept and record conversations and actions to which they would not otherwise be privy and that possession of said

recordings would create an advantage in the issues regarding JUNIOR'S and Cathy's divorce proceedings.

32.     On information and belief, and after several months of recording, JUNIOR brought the recordings to the attention of defendant MJ DONOVAN in an effort to present evidence in the aforementioned divorce and custody case.  On information and belief, the recordings were presented to MJ DONOVAN in a viewable format.  MJ DONOVAN used specific information in said recordings on or about December 18, 2009 in conversations between MJ DONOVAN and Cathy's counsel, and overheard by Cathy.  As a result of the threatened use of these illegal intercepts, MJ DONOVAN, MICAHEL MCCAFERTY AND JUNIOR blackmailed, coerced, intimidated and strong armed Cathy into agreeing  to every single one of the demands made by JUNIOR'S counsel, MJ DONOVAN.  Cathy's lackluster attorney then abruptly left the case, leaving Cathy homeless, with loss of custody of her beloved children, and penniless due to the fact that JUNIOR had years earlier blocked her access to her own banking account -  substituting instead a strict allowance with which she had to buy all the supplies and food of the busy home. Cathy often went without eating, in order to "make budget." This, mind you,  during a boom time for construction companies two of which JUNIOR is supposedly CEO or president. Cathy can never know how much was made, as mentioned she was blocked from any and all family financial affairs. The divorce Court in Ohio bought into this fable, and JUNIOR never had to pay a dime in alimony, or child support, and in fact had the audacity and lack of morality to demand monthly payments from HER.

10

33.    It was later learned that JUNIOR and BERGMAN had also GPS'd Cathy's car and had "Skyhook" software monitor and record her every move 24 hours a day for an unknown period of time. The actual period has been permanently stored on Skyhook's servers. Despite a herculean effort over more than a year of unrelenting spying on his defenseless wife, JUNIOR never found any evidence of infidelity. His schemes for a perfect divorce had been hatched years earlier and evidenced by his blocking Cathy from the family finances, naming his brother as inheritor of his various insurances, and having blocked off parts of the marital home. Having found no evidence with which to blackmail Cathy, JUNIOR switched tactics and began to tell Cathy that she should "make friends" on AOL when her repeated requests for more personal time were met with his angry stare. He then mysteriously began to pay for AOL and the internet. Soon thereafter, he installed Webwatcher software, in hopes of "getting the goods" on his wife, and blackmailing her with the information so that he could "get EVERYTHING " in his divorce. To this end, JUNIOR then enlisted his willing sister BERGMANN as his conspirator in a brutal campaign intent on destroying the reputation of his unfortunate wife. Those activities continue to this day as he repeatedly attempts to show the illegal evidence, no doubt altered to benefit his campaign, to her family and friends, causing Cathy to be a pariah in her community, as JUNIOR made himself out to be the poor unwitting victim of this "Harlot." Most damningly, JUNIOR pulled over Cathy's first son Zach in the driveway of his home during the divorce, and showed him some more racy intercepts (supposedly from his mother) in a grotesque attempt at parental alienation. Zach, an adult resident of Cincinnati, Ohio, is willing to testify as to the event of that day, and the exact communications he was forced to witness by JUNIOR.

11

34.    Discovery requests of all recordings (video, computerized and/or an audio) was demanded of JUNIOR and MJ DONOVAN without response.

35.    Sometime after her preliminary court hearing in December 2009, Plaintiff was informed by Cathy that JUNIOR and his attorney, defendant MJ DONOVAN, had shown up to the courthouse with a box of various recorded media, including supposed audio and video recordings of encounters between Cathy and various individuals, including Plaintiff.

36.    Cathy was not shown the contents of the box.

37.    Plaintiff did not know the contents of the box, nor did Cathy.  Plaintiff did not know if his telephone home conversations had been recorded or his electronic communications intercepted.

38.    Plaintiff later learned in the summer of 2010 from Cathy that JUNIOR had indicated to her that he may have also intercepted her Emails and private Instant Messages between her and numerous individuals, Plaintiff among them.  Although JUNIOR did not admit to interceptions of oral communications between Plaintiff and Cathy, Plaintiff believes his oral communications were also intercepted in further violation of state and federal wiretapping laws.

39.    When repeatedly demanded in court to show discovery, JUNIOR and MJ DONOVAN simply ignored the requests or continued to stall the motions.  Any of the contents of the box remained unknown to Cathy until late into the summer of 2010.

40.    Plaintiff then requested proof from Cathy of any of the supposed intercepts which JUNIOR and MJ Donovan had used on the courthouse steps to intimate, coerce and

12

blackmail Cathy and her incompetent attorney. Cathy could not comply as her repeated requests for discovery were being ignored or refused by JUNIOR and MJ DONOVAN.

41.     In defiance of a court order of discovery within 30 days, JUNIOR and MJ DONOVAN continued their stall tactics, and did not produce the requested documentation to Cathy. Without the production of the discovery evidence, Plaintiff could not have known nor could accurately speculate as to the true nature of the contents of the box.

42.     It was not until July or August of 2010 that Cathy's attorney was finally in receipt of some of the evidence demanded of them during discovery, information that had been ordered by the judge back in December of 2009. It was then that JUNIOR and MJ DONOVAN sent Cathy's new attorney a sample of the communications that JUNIOR had illegally intercepted.

43.     Late in the summer of 2010 Cathy then mailed to Plaintiff a small sample given to her by her attorney of some of the electronic communications had been intercepted by JUNIOR. Plaintiff could then see that some of his communications seemed genuine, although Plaintiff denies that they are all genuine or have not been altered in some way. Plaintiff was also given a copy of JUNIOR's deposition in which he claimed to have only used the illegal spyware for a period of a month or two in late summer of 2009.

44.     Sometime after the deposition, presumably by a clerical error by someone in MJ DONVAN'S law office, Cathy's attorney was forwarded a more complete set of illegal electronic intercepts her office had at its disposal, but had apparently counseled JUNIOR to claim did not exist in his deposition.

13

45. To Plaintiff's and Cathy's surprise and dismay, these intercepts clearly proved that JUNIOR'S illegal computer hacking and snooping dated back much further than the period of time to which he had testified to have used the spyware. Upon inspecting the unexpected cache of undeclared evidence, Plaintiff realized that some of these intercepted communications dated back to the beginning of 2009, not the summer of 2009 as JUNIOR had testified to under oath at the deposition.

46. Given such set of circumstances, Plaintiff alleges JUNIOR and MJ DONOVAN, fully aware of potential daily financial penalties imposed by the Electronic Communications Privacy Act of 1986 ("ECPA"), intentionally set about to defraud the court in JUNIOR'S deposition in order to minimize any anticipated civil or criminal liability. Plaintiff alleges that MJ DONOVAN and DONOVAN LAW purposefully counseled JUNIOR to perjure himself at the deposition as part of a long term strategy aimed at minimizing his financial exposure in any potential future civil or criminal action for the illegal intercepts that MJ DONOVAN, defendant MCCAFFERTY, and DONOVAN LAW knew or should have known were illegal and carried large civil and criminal fines. This unscrupulous legal tact was clearly designed to limit JUNIOR'S potential civil liability to approximately 45 days of illegal spyware use instead of more than 9 months (270 days) of illegally intercepted electronic communications.

47. Given such set of circumstances, Plaintiff alleges JUNIOR and MJ Donovan, fully aware of potential daily financial penalties imposed by the Electronic Communications Privacy Act of 1986 ("ECPA"), intentionally set about to defraud the court in JUNIOR'S deposition in order to minimize any anticipated civil or criminal liability. Plaintiff alleges

that MJ Donovan and DONOVAN LAW purposefully counseled JUNIOR to perjure himself at the deposition as part of a long term strategy aimed at minimizing his financial exposure in any potential future civil or criminal action for the illegal intercepts that MJ Donovan, McCafferty, and DONOVAN LAW knew or should have known were illegal and carried large civil and criminal fines. This unscrupulous legal tact was clearly designed to limit JUNIOR'S potential civil liability to approximately 45 days of illegal spyware use instead of more than 9 months (270 days) of illegally intercepted electronic communications.

48.     Plaintiff alleges that MJ Donovan, McCafferty and DONOVAN LAW, in breach of all ethical legal practices in Ohio, had advised JOSEPG ZANG to withhold some of his evidence in order to hedge their bets in case JUNIOR was later subject to civil penalties provided for in Florida's SOCA, section 2520 2(b) of ECPA, and the O.R.C. that provides up to $100 per day of having used the illegal methods of intercept or $10,000, whichever is greater. By perjuring himself JUNIOR was attempting to reduce the amount of days to which he could possibly later be exposed to civil and criminal liability.

49.     Plaintiff alleges JUNIOR and his attorney MJ Donovan using a calculated, illegal and unethical legal strategy, set about to maximize impact of such recordings , using Plaintiff's private conversations as a battering ram against Cathy, in order to intimidate, bully, blackmail, and coerce her to drop any attempt at defending her case, and give in to his demands while minimizing any potential fines if such intercepts were later the basis of a civil action, having run afoul of state and federal laws.

50.     This complaint alleges JUNIOR and MJ Donovan violated the federal wiretap law and Florida's SOCA law when electronic communications originating from Plaintiff's

15

computer located in Florida, were intercepted in transmission using Web Watcher, an

automatic routing software JUNIOR and BERGMANN had installed on the home computer

in Ohio. Internet messages in particular, can only be intercepted "in transmission," as they are

not stored on the home computer in any way. Web Watcher bills itself as " the only

computer monitoring software that lets you monitor as many devices as you want with one

interface. Web Watcher records all PC activity including emails, IMs, websites visited, web

searches, Facebook/MySpace activity, and anything typed in real time....Web Watcher will

also take screenshots of selected activity." Plaintiff believes Web Watcher specifically targets

spouses in their marketing campaigns, enticing them with the lure of finding out everything

their spouses are doing in their private accounts. Plaintiff also believes his own computer

may have been infected by JUNIOR and BERGMANN'S illegal hacking and spyware use.

All such spyware use was permanently recorded on Web Watchers servers and Plaintiff

requests this Court issue a subpoena for access to the true extent of JUNIOR and

BERGMANN's intensive surveillance and computer hacking campaign against Cathy and

Plaintiff.

     51.    Florida's SOCA and Ohio's Revisited Code allow for similar civil   penalties

and remedies provided for in the previously discussed ECPA statute. Plaintiff asserts that, in

an attempt to avoid a daily fine, they purposefully and strategically omitted the true start date

of his illegal spyware use. Proof of the start date of his spyware was permanently recorded on

the WebWatcher software maker's servers.

     52.    Plaintiff further alleges MJ Donovan, McCafferty and DONOVAN LAW

were in breach of ethical practices set for practicing attorneys in the state of Ohio, as she

used the power of her title as a weapon for JUNIOR against CATHY, and that her unethical

behavior in this case has irreversibly damaged both himself, Cathy, and even their own

legally jejune client JUNIOR whose knowledge of the law in this arena was obviously

limited and not expected to be held to the standards of a practicing attorney and her partner.

Indeed her unethical malpractice simply exposed him to various lawsuits, and yielded

nothing he could legally use in his contentious divorce versus, and instead birthed multiple

lawsuits against him. These intercepts were illegal, and ruled as such by the judge in the

divorce case. MJ DONOVAN ignored this and continued her blackmail and smear campaign

against the mother of four.

     53.    Plaintiff knows for a fact that JUNIOR has used the illegal intercepts in an

ongoing process of defamation of character aimed at Cathy but also by implications,

Plaintiff, by showing the intercepts to third parties in an attempt to slander Plaintiff's and

Cathy's reputation in community.

     54.    Plaintiff is aware of more than two incidents where JUNIOR has approached

family members of Cathy in order to disgrace her and Plaintiff, and defame their character.

     55.    Plaintiff is aware of at least one incident where JUNIOR has actually shown

his electronic communications to a third party who can testify under oath that JUNIOR

showed him intercepted emails and conversations between Plaintiff and CATHY, some of

them most probably altered by JUNIOR, to one of Cathy's own sons, ZACH, in a vicious,

brutal and ongoing campaign of emotional abuse, terror, control, defamation of character,

stalking, and most insidiously of all; parental alienation.

56.     A motion in limine was filed in the divorce action by Cathy, whereby the recordings that were threatened to be used were excluded from proposed evidence and deemed "illegal".

57.     These recordings, some of which seem legitimate, but others seemed to have been altered for greater effect, remain in the custody and control of the Defendants.

58.     During the lengthy process of the divorce case, Defendant McCafferty appeared before the court handling the divorce and made specific statements to the Court referencing the contents of communications intercepted by JUNIOR between Plaintiff and Cathy. McCafferty is a principal member of Donovan Law and made an appearance in the Zang divorce case.

59.     Also during the divorce upon information and belief to be between August 2010 and September 2011, MJ Donovan attempted to allow the divorce case's appointed Guardian Ad Litem review the already deemed "illegal" recordings, some of which undoubtedly included illegal intercepts of Plaintiff, in another attempt to gain advantage in the divorce case, specifically for advantage of custody, visitation and child support issues.

60.     Defendants MJ Donovan, McCafferty and Donovan Law repeatedly used known evidence of violations of privacy, of the Wiretap Act , Florida's SOCA, and of Ohio's Interception of Wire, Oral or electronic communications Statute in furtherance of the firm's client, JUNIOR's desire to harm Plaintiff's character and Cathy's position in the divorce case as well as the value of her presumed witnesses. Cathy later was told by JUNIOR that he would ensure that she "never dated ANYONE again" even after their divorce. A similar

statement was made in front of the Guardian Ad Litem, wherein she reproached him and told

him he had no say in who she dated post divorce. JUNIOR's need for control and

manipulation continued after however, as a hired gun has now caused thousands of dollars

worth of damage to her car, in a cruel and sadistic attempt at vengeance and continued

control. JUNIOR always has a convenient alibi for these days.

61. Defendants MJ Donovan, McCafferty and Donovan Law repeated use of

these thousands of illegal intercepts, has been interpreted in various internet cases as having

"reached out" to the offended state from which it had mined the illegal intercepts and in this

case it is enough to allow long armed statutes to be applied and this satisfies minimum

contacts requirements.


V.         COUNTS AGAINT DEFENDANTS

### COUNT I
### FOR VIOLATIONS OF 18 U.S.C.A. §2510 ET SEQ. ("WIRETAP ACT")

62. Plaintiff restates and re-alleges section IV, numbers 1-51.

63. Defendants, and each of them, engaged in one or more of

the following acts in violation of federal law:

(a) Defendants intentionally intercepted, endeavored to intercept, or procured other

persons to intercept oral communication;

(b) Defendants intentionally disclosed, or endeavored to disclose, to other persons the

contents of oral communication, knowing or having reason to know that the

19

information was obtained  through the interception of a wire, oral or electronic communication in violation of the above-referenced law; and/or

(c) Defendants intentionally used, or endeavored to use, the contents of oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the above referenced law.

64.     As a result of Defendants' conduct Plaintiff is entitled to damages and other relief against each defendant as set forth in 18 U.S.C.A. § 2520, including but not limited to statutory damages of Ten Thousand Dollars ($10,000.00), punitive damages and reasonable attorney fees and other litigation costs reasonably incurred.

## COUNT II

## INVASION OF PRIVACY AND CONSPIRACY TO COMMIT INVASION OF PRIVACY

65.     Plaintiff restates and re-alleges section IV, numbers 1-54.

66.     Plaintiff had an objectively reasonable expectation of privacy in the conversations and electronic communications that took place between himself and Cathy. The conversations and communications were private, and Plaintiff had a right to keep the content of such conversations private.  In addition, the Defendants  disclosed private and potentially embarrassing facts to the public that were of no legitimate concern to the public.

67.     Defendants, and each of them, combined to accomplish by their concerted actions an intrusion upon Plaintiff in his place of seclusion by their conduct as described herein.

20

68.    The intrusion upon the Plaintiff as described herein would   be highly offensive to a reasonable person.

## COUNT III

## VIOLATIONS OF FLORIDA'S SECURITY OF COMMUNICATIONS ACT (SOCA)

69.    Plaintiff restates and re-alleges section IV, numbers 1-58.

70.    Defendants' conduct violated SOCA § 934.03

71.    As a result of Defendants' conduct Plaintiff is entitled to damages and other relief against each Defendant as set forth in SOCA §934.10 including;

(a)    Preliminary or equitable or declaratory relief as
may be appropriate;

(b)    Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(c)    Punitive damages; and

(d)    A reasonable attorney's fee and other litigation costs
reasonably incurred.

## COUNT IV

## VIOLATION OF OHIO REVISED CODE 2933.52

72.    Plaintiff restates and re-alleges section IV, numbers 1-61.

73.    Defendants' conduct violated O.R.C. § 2933.52.

21

74.    As a result of Defendants' conduct, Plaintiff is entitled to damages and other relief against each Defendant as set forth in O.R.C. 2933.65, including Ten Thousand Dollars ($10,000.00) and reasonable attorney fees and other litigation costs reasonably incurred.

COUNT V

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BULLYING<br>AND HARRASSMENT

75.    The defendant's conduct as described above was intentional and reckless, extreme and outrageous.

76.    The defendants' intended irreparable harm to Plaintiff. Defendants' sever misconduct and illegal activity has caused severe physical and emotional distress to Plaintiff.

77.    The conduct of defendants has been sufficiently outrageous as to entitle Plaintiff to an award of punitive damages.


WHEREFORE, Plaintiffs JAVIER LUIS requests that this Court:

 Award punitive damages against the Defendants, and each of them, jointly and severally;

Award  statutory damages for federal and state claims for Plaintiff against each Defendant in the amount of $54,000.00 ($594,000.00 total).

Award general damages for harm to the Plaintiff's interest in privacy in an amount to be determined at trial;

Award special damages in the amount to be determined at trial;

22

Award the cost of this action, including attorney's fees, to Plaintiffs; and

Award access to Web Watcher's permanent records concerning the extent of JUNIOR'S illegal use of their software;

Compel JUNIOR to turn over the dvr and all illegal interceptions to Plaintiff and Cathy and that the contents of the DVR be examined forensically, at JUNIOR'S expense, in order to find the true extent of JUNIOR'S illegal interceptions of wire, oral and video communications;

Award injunctive relief from further slander and use of the illegally intercepted communications by JUNIOR and any of the defendants and such other relief as the Court may deem just and equitable.

JURY DEMAND

Plaintiff hereby demands trial by jury on all issues submitted in this complaint.

Dated June 13, 2012

Respectfully Submitted,

Javier Luis Pro Se
4414 W. Minnehaha St.
Tampa, Florida 33614

23